Land Title Bank and Trust Company, Appellant, *v.* Pennsylvania Public Utility Commission.

Argued October 17 and 18, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER and RHODES, JJ.

*John V. Lovitt,* with him *Thomas Burns Drum,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellant.

*Samuel Graff Miller,* with him *Harry M. Showalter,* for appellee.

*Frank M. Hunter,* for intervening appellee.

OPINION BY STADTFELD, J., January 30, 1940:

This is an appeal from the action of the Pennsylvania Public Utility Commission denying appellant the right to purchase electric service under a wholesale rate contained in the tariff filed by the respondent electric company.

Appellant owns and operates an apartment development known as Villa D'Este, located in Upper Darby

Township, Delaware County, Pennsylvania. This development consists of 264 apartments constructed and operated as a group.

Respondent now meters each apartment separately and bills at its "residence rate", although these bills (with few exceptions) are sent to and paid, not by the individual tenants of the apartments, but by appellant.

On October 31, 1934, appellant demanded that respondent furnish electric service for the entire development metered at a single point under respondent's W.L.P. (wholesale light and power) rate. Respondent made several tests which show that the W.L.P. rate would result in substantial reduction. Respondent refused appellant's demand and on October 28, 1935, appellant filed a complaint with the Public Service Commission to compel respondent to grant appellant the W.L.P. rate. The case was heard and argued before the Public Service Commission but that Commission went out of existence without deciding the case, and on March 7, 1938, the newly created Pennsylvania Public Utility Commission entered an order dismissing the complaint. A petition for rehearing and reargument was presented and dismissed on October 10, 1938.

It is agreed that as far as the quantity of consumption is concerned, appellant meets the requirements of the tariff but the Commission denied that appellant was a "customer" within the meaning of the tariff.

By stipulation, made part of the record, complainant and respondent agreed on most of the facts deemed by either to be relevant and material.

Sometime in 1926, John H. McClatchy, a real estate developer, purchased a tract of land in Upper Darby Township, Delaware County. In the same year, he received permits for construction of dwellings to be erected on this tract of land. Pursuant to the authority granted by these permits he built 66 structural units which were divided into 132 vertical duplex dwellings or 264 apartments now known as the "Villa D'Este".

The Villa D'Este Development is described as follows: One apartment section parallels the south side of Glenthorne Road; another section directly south and paralleling the former with an open court between is on the northern side of Radbourne Road; another section paralleling the above two sections is on the south side of Radbourne Road; another section northwest of the intersection of Glenthorne Road and Guilford Road runs in a northerly and southerly direction; and the last section is northeast of the intersection of Glenthorne Road and Alderbrook Road paralleling the latter road, and runs approximately in a northeasterly-southwesterly direction.

While the structures were in the course of construction, the said John H. McClatchy made application to the Delaware County Electric Company, since merged into the respondent company, requesting provision of the necessary facilities for electric service to the said development. The application contemplated the separate supply and separate metering of electricity by the electric company to each of the 264 apartments or residences. Pursuant to this request, the Delaware County Electric Company installed the necessary equipment and the requested service has been maintained since that date. Intervenor's investment for the installation of this service exceeded $8500.

Prior to July 30, 1926, the said John H. McClatchy, placed upon each vertical half of each of the 66 apartment structures, that is to say, upon each of the 132 vertical duplex dwelling structures, first and second mortgages. The first mortgages are owned by various unrelated entities. The second mortgages are owned by four separate and unrelated building and loan associations, the properties to which the mortgages appertain not being contiguous.

On July 30, 1926, and subsequent to the placing of the mortgages, the said John H. McClathy, and Mary

E., his wife, conveyed the property to The Land Title and Trust Company by deed.

On August 2, 1926, a certain agreement of trust was executed wherein the said John H. McClatchy and Mary E., his wife, were parties of the first part, and the Land Title & Trust Company was party of the second part, and the holders of certificates under the terms of the agreement and their assigns were parties of the third part.

The trustee had the power and duty to collect certain charges from the certificate holders and allocate the charges so collected for payment of taxes, mortgage interest, insurance, building and loan dues, interest and premium, janitorial service, and for making ordinary repairs necessary to maintain the external structure. The trustee also had the authority to refinance the mortgages for the same amount if refinancing was necessary.

The rights and interests of the various Certificate Holders are stated in the trust| agreement and the several schedules appended and endorsed thereon as follows: "This certifies that ...... as holder of one of these certificates is (or are) entitled to the exclusive ownership and occupancy of apartment ...... of Apartment House No. ...... under the terms of the Deed of Trust."

All Certificates of Ownership but 12 were issued to purchasers who had paid the said John H. McClatchy. These remaining 12 were issued in the name of John Dolan, straw man for the said John H. McClatchy. After a time, and from time to time, holders of various ownership certificates defaulted in the payment of the monthly charges due under the Agreement of Trust. As a consequence of the defaults by the various certificate holders the Trustee exposed for sale at public auction the equitable interests of the defaulting parties, including the equitable interests in their shares of building and loan stock. The Ownership Certificates were struck down at said public auction to the said John H. Mc-

Clatchy or to his nominee or to the said Trustee or to its nominee. At a later date, because of the numerous defaults by certificate holders, various of the second mortgages covering the vertical premises as aforesaid, became in default. As a result of the defaults in the second mortgages, an agreement was entered into on December 21, 1933, between the said John H. McClatchy and Mary E., his wife, the Trustee and all the second mortgagee building and loan associations. This agreement, in essence, provided that the said John H. McClatchy transfer to the respective mortgagee building and loan associations the "Ownership Certificates" acquired by him or for him in the various public auctions and the twelve "Ownership Certificates" issued to John Dolan, straw man for John H. McClatchy, as herein earlier mentioned, and also transfer all his right, title and interest under the Trust Agreement to the holders of the second mortgages. The agreement of December 21, 1933, in addition, provided that The Real Estate Land Title & Trust Company should collect "from the occupants of the various apartments the sums payable by them either as Certificate Holders or as Lessee of the apartments." The sums collected from the "Certificate Holders shall be applied as heretofore in accordance with the Agreement of Trust. The rentals from the leased apartments shall be applied to operating expenses including Trustee's expenses, to the payment of the taxes and interest on first mortgages on the leased apartments and to pay over any remainder to the Building and Loan Associations in proportion to the amount of mortgages held by them respectively on all of the apartments which are not occupied or equitably owned by the Certificate Holders."

After the agreement of December 21, 1933, defaults occurred on additional second mortgages by reason of defaults in monthly payments due under the Agreement of Trust on the "Ownership Certificates" and the Trustee, from time to time, declared the original

"Ownership Certificates" forfeited and issued what purported to be "Ownership Certificates," to the proper building and loan associations holding the second mortgages on the vertical structures to which said default "Ownership Certificates" appertained.

It appears therefore, from an analysis of the record that at the time of the filing of the stipulation of evidence, the situation was such that there were 59 nondefaulting certificate holders who were in possession of the apartments to which the certificates appertained. The remaining 205 certificates were in possession of four building and loan associations because of failure by the various certificate holders who were entitled to "equitable ownership," and the use and occupancy of the apartments to which they appertained, to pay the necessary charges, in consequence of which, the second mortgages on the vertical dwellings became in default.

Complainant in an endeavor to establish its right to come within the classification of Wholesale Light and Power Rate, presents the contention that it is a "customer" within the meaning of that classification because it operates as a business unit and for a single purpose through the medium of an association commonly referred to as a "Massachusetts Common Law or Business Trust."

In passing, we might call attention to the fact that the trust agreement between John H. McClatchy of the first part, and The Land Title & Trust Co., trustee, of the second part, and the certificate holders who joined therein, while providing for the collection from the certificate holders of certain sums to pay for taxes and water rents upon the unit of 'which their respective apartments formed a part, and other charges for maintenance, repairs, etc., did not provide for the collection of any sum for electric service.

It is not necessary for us to pass on the nature or legal effect of this trust agreement, except to the extent necessary to decide whether appellant should be

afforded the benefits of the Wholesale Light & Power rate classification of respondent's tariff.

Our attention has been directed to the following excerpts from respondent's tariff: "Definition of terms and explanation of abbreviations. ...... Customer. Any person, partnership, association or corporation lawfully receiving service from the company."

"The Electric Service Tariff. Application. The tariff provisions apply to everyone lawfully receiving electric service from the company, under the rates therein, and receipt of electric service shall constitute the *receiver* a *customer* of the company as the term is used herein, whether service is based upon contract, agreement, accepted signed application, or otherwise." (Italics supplied).

"Tariff Options. Choice of Rate. Where the class of service-supply or conditions of use are such that two or more rates are available, the customer shall select the rate or rates to be applied to his service."

"Rate PD Primary-Distribution Power. Availability. Untransformed electric service from the primary supplylines of the company's distribution system where the customer installs, owns, and maintains, any transforming, switching and other receiving equipment required."

"Rate WLP. Wholesale Light and Power. Availability. Electric service for use in large quantities for light and/or power, at the option of the customer."

Respondent's Rule 2.2 provides: "2.2 Single Point Delivery. Unless otherwise stipulated therein, the rates named in the Tariff for each class of service are based upon the supply of the service to one entire premise through a single delivery and metering point. Separate supply for the same customer at other points of consumption shall be separately metered and billed."

As a result of the transactions hereinbefore recited, some of the dwellings now are held and occupied by non-defaulting certificate owners; some are occupied as tenants respectively of four unrelated Building and

Loan Associations, mortgagees-in-possession; some are occupied by tenants of a building and loan association claiming ownership through the settlor of the trust and some are occupied as tenants of a fifth building and loan association. Also, by reason of the same, appellant functions as trustee under the trust as to the certificate owners, as a rental agent severally for each of the four mortgagees-in-possession and as a rental agent for the building and loan associations, not mortgagees-in-possession.

Because of the physical, structural and geographic characteristics of the development and of the manifold ownership, possessory and occupancy interests pertaining thereto, intervening appellee declined to treat the 264 dwellings or the appellant in its diverse relationships thereto, as a single customer unit for single point electric service.

Quoting from the report of the commission: "Taking into consideration all the evidence presented, that the Certificate Holders are the 'equitable owners' and in many instances the occupants of each apartment, that the trustee's duties are limited and not discretionary, that no profit was contemplated, that the whole group of apartment house dwellings in general does not have common conveniences, that for all practical considerations each is a separate and distinct residence having all the necessary facilities and being entirely complete in itself, it is our opinion that this association is not such a bona fide business unit as would entitle it to come within the Wholesale Power and Light Classification of respondent's tariff.

"To sustain this complaint would be to sanction the organization of whole blocks of individual owners into associations like these for the sole purpose of affording themselves the benefits of a classification to which, as individuals, they would not be entitled. These associations could re-distribute the energy to the owners and occupants of the various premises. This device would

not necessarily confine itself to electric companies but could be employed by individual owners to afford themselves the benefits of more favorable classifications of other utility companies. The effect of such an arrangement would be to result in upsetting the whole rate structure under which the service of the Philadelphia Electric Company and other utilities is furnished, to the detriment and discrimination of thousands of other individual consumers; ......".

To permit separate customer units to combine for single point service would be to violate the fundamental theory upon which the pricing of intervenor's tariff schedules are based.

The instant case is governed by *Hunter v. Pa. P. S. C.*, 110 Pa. Superior Ct. 589, 168 A. 541, in which we stated: "We do not think that the mere fact that the contract for supply is made with the individual who owns all of the properties, is controlling of the situation in view of all the other circumstances connected with the use of the properties ...... 'Neither the fact that there are several buildings on the plot receiving separate services, nor the fact that the sole owner of these buildings would be the contracting party for water service rendered thereto, are the factors upon which to determine this complainant's grievance. The real point at issue is whether the complainant is a single commercial-industrial consumer receiving water for the purpose of one business unit, or whether the thirty-four tenants are each essentially separate domestic and/or commercial consumers.' ......".

In that case, the principle of single point metering was denied even where the separate structures were truly owned by one entity, where they were contiguous to one another, and where no public highways divided their treatment.

The other customers and buildings to which appellant calls attention in its brief bear no similitude to those in the instant case.

A similar question to that in the instant case was involved in the case of *U. S. v. American Water Works Co.* (Circuit Court D. Nebraska) reported in 37 Fed. Reporter, 747 (1899), where in an opinion by BREWER, J., a similar conclusion was arrived at as stated in the syllabus of that case: "The Omaha water-works ordinance provides that the company shall furnish water to citizens residing along the line of its mains at certain rates, and gives a tariff for dwelling-houses according to the number of rooms and other buildings of different kinds. Rents for other purposes are fixed by meter-rates, lowering inversely to the amount of water taken. Held, that the company has the right to treat each building separately; and the United States, as owner of the Fort Omaha reservation,—a tract of many acres, on which are dwellings for officers, hospitals, warehouses, and barracks,—is not entitled to be supplied as a single consumer." See also, *Thompson v. City of Goldsboro,* 151 N. C. 189, 65 S. E. 901; *Brand et al. v. Water Com'rs of Town of Billerica,* 242 Mass. 223, 136 N. E. 389.

Section 1107 of the Public Utility Act (66 PS Pocket Part, §1437) provides: "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission or violation of constitutional rights."

After a careful consideration of the entire record, we believe the commission was justified in finding that neither Villa D'Este nor appellant in its relation thereto, constituted a single customer for the purposes sought in the complaint. Any other determination would be a discrimination in the petitioner's favor as against other retail customers similarly situated.

The assignments of error are overruled and the order of the commission is affirmed at the costs of appellant.