CITY OF ANCHORAGE, a Corporation, Appellant,

v.

RICHARDSON VISTA CORPORATION and Panoramic View Corporation, Appellees.

No. 15082.

United States Court of Appeals Ninth Circuit.

Feb. 21, 1957.

John L. Rader, Lynn W. Kirkland, City Atty. of Anchorage, Anchorage, Alaska, for appellant.

Hellenthal, Hellenthal & Cottis, and Albert Maffei, Anchorage, Alaska, and Reischling & Chan, Seattle, Wash., for appellees.

Before POPE and FEE, Circuit Judges, and ROSS, District Judge.

ROSS, District Judge.

This case comes to us on appeal from Alaska, and concerns the proper application by the City of Anchorage of its electric power rate schedules to certain apartment houses owned and operated by the plaintiffs in the City of Anchorage. The District Court upheld the contentions of plaintiffs that the City had erroneously applied its schedule of rates. From this judgment the City appeals.

Richardson Vista Corporation and Panoramic View Corporation, hereinafter referred to as "Vista" and "Panoramic" are two housing corporations owning and operating multiple apartment buildings in Anchorage, Alaska. Vista owned nineteen separate apartment buildings with twenty-two units in each, for a total of four hundred eighteen separate apartments, the project being situate on a twenty-three acre tract of land. Panoramic owned and operated fourteen separate apartment buildings over a seventeen acre tract, with twenty-two, sixteen and twelve units per building, with a total of two hundred sixty-four apartments. Electric energy was furnished to these apartment house buildings by the City of Anchorage, a municipal corporation, engaged in the proprietary business of operating an electrical power generating and distribution plant.

The meter panel in each separate apartment building contained a meter for each individual apartment in the building, plus a so-called "house" meter. We are not concerned with the "apartment" or "tenant" meters and no further reference will be made to them. The "house" meter reflected power consumption of the common facilities maintained by plaintiffs in each building for the common use of the tenants such as hallways, basement, operation of heating system, etc., the cost of which was borne by the plaintiffs. Consequently there were nineteen separate "house" meters used in connection with the nineteen buildings operated by Vista and fourteen in the fourteen buildings operated by Panoramic.

The plaintiffs were charged and billed under the City's "Schedule (C) Commercial" of its published rates in the same manner as though there had been a separate ownership of each of the total thirty-three apartment houses. It is obvious that under this method and practice of "separate" billing the plaintiffs did not enjoy the benefits that would have accrued had Vista's nineteen "house" bills, and Panoramic's fourteen "house" bills been totalled, and the decreasing sliding scale charge for KWH consumption contained in Schedule C been applied. The plaintiffs contend that the action of the City in billing them as single customers as to each 1-point connection in each building, and refusing them the benefits of "combined" billing to which they insist they are entitled, constitutes, as to them, an erroneous application of Schedule C. In their complaint against the City it is alleged:

"(Par. XII) That by virtue of defendant's erroneous and incorrect application of its commercial rate to plaintiffs' consumption of electrical energy, each of plaintiffs have paid for electrical energy in an amount grossly in excess of what plaintiffs should rightfully pay had defendant's commercial rates been properly applied to plaintiffs' consumption, * * * that defendant in the application of its electrical rate to plaintiffs, has acted arbitrarily, unjustly, unequally, unreasonably, discriminatorily, non-uniformly, and confiscatorily to its unjust enrichment and will continue said practice unless restrained."

In the following paragraph XIII it is alleged "that other electrical consumers * * * similarly situated * * * are given the benefit of but one application of Schedule C * * *" However the record fails to support this allegation. There are no like groups of

apartment houses receiving different billing treatment than plaintiffs.

The prayer of the complaint is that (A) the City "be enjoined from charging each of plaintiffs defendant's commercial electrical rate or tariff in the manner aforedescribed," that is with a single separate billing for each separate apartment house, "and ordered to apply the commercial rate of each of plaintiffs' total consumption," namely, that it be required to total or "combine" all of the separate billings for each plaintiffs' total number of apartment houses into one "combined" bill, "and be ordered to desist from charging each of plaintiffs' buildings as if they were separate consumers of defendant." (B) "That the City * * * be ordered and directed to repay plaintiff Richardson Vista Corporation the sum of $2,530.-97," later increased to $20,590.66 plus $400.00 per month subsequent to December, 1954, in a supplemental complaint, "with interest at the rate of six per cent per annum from date of each respective protest until so repaid, and similarly the amount of $1,408.77 to plaintiff Panoramic View Corporation." This amount was also increased in a supplemental complaint to $14,436.27 plus $200.00 per month subsequent to December, 1954. All power bills were paid by the respective plaintiffs under protest.

In its answer the City denies all allegations of the complaint relating to discrimination and wrongdoing, admits the practice of "single" billing, a separate bill for each separate building, asserts that Schedule C was properly applied; and that such method of rate application and billing was entirely proper.

Plaintiffs do not here challenge the legality of the rates, rules and regulations set forth in Schedule C. There is no question raised that the rates are excessive, or that the rules are in themselves discriminatory. It is merely said, paragraph XII of the complaint, that the defendant, in the application of its electrical rate to plaintiffs, "has acted arbitrarily, unjustly, unequally, unreasonably, discriminatorily, non-uniformly and confiscatorily," and that this came about through an *"erroneous and improper application of its commercial rate,"* Schedule C, *"to plaintiffs."* (Italics ours.)

It is obvious, too, that the record does not support the complaint insofar as a cause of action is set out in paragraph XIII on discrimination. No discrimination is shown either against plaintiffs individually, or as members of a class discriminated against.

The case was heard before Judge Folta who filed his opinion but came to his death before entering findings of fact and conclusions of law, and judgment. Judge McCarrey entered judgment for plaintiffs. F.R.Civ.P. Rule 63, 28 U.S.C.A. He took the position that the opinion was sufficiently comprehensive to take the place of the customary findings of fact and conclusions of law. F.R.Civ. P. Rule 52.

We think it proper to comment on the matters set-out in the opinion and to that end quote such parts thereof as we deem pertinent, and necessary, to make our remarks understandable.

"The City contends that the installation and maintenance of a separate service drop and meter at each building warrant the classification made and points to the fact that all identical housing projects, as well as more than 200 multimeter consumers within its corporate limits, are similarly dealt with.

"* * * but as I view the case, out of the welter of contentions only two questions emerge, (1) *whether a housing project consisting of several buildings erected on one tract of land and owned by one 'person' is an 'establishment' within the meaning of Schedule C of the City's rate tariffs, and (2) if so, whether the practice of the City in refusing to combine meter readings is in conflict with the schedule.* (Italics ours.)

"It appears that before these housing projects had been completed in 1951, the plaintiffs discussed the matter of rates with some of the officials of the City with the view of obtaining the benefit of conjunctive (combined) billing.

"Apparently all the parties thought Ordinance No. 55 (original rate structure, rules and regulations adopted by the City in 1925 and repealed by implication by the adoption of Ordinance 283 in 1949) was still in effect. It provided that in no event would separate premises even though owned by the same consumer, be supplied with electricity through the same meter or meters, and expressly prohibited combined meter readings.

"The sections containing these provisions had, however been repealed on August 24, 1949, by Ordinance No. 282, without a reinactment of these provisions. Section 602.1 of that ordinance empowers the City Manager to make and publish rates and charges for electrical energy and service, and Sec. 608.1 provides that

" 'The City Manager, with the approval of the City Council, may adopt and promulgate such rules and regulations as may be necessary pertaining to the supplying and discontinuance of electric service to all customers, including but not being limited to rates, charges for connecting and disconnecting service, separate meters for separate premises * * *' "

"*Schedule (C) Commercial Rate*
"This service applicable to single phase service for lighting, cooking, small appliances and incidental single phase motors not in excess of five (5) horsepower, *in professional, mercantile, industrial and other establishments* but not classed as single family residences."
(Then follows rates dropping from 10¢ for the first 25 KWH to 4¢ for in excess of 2125 KWH. Italics ours.)

"It is in this setting that the plaintiffs presented their demand for conjunctive (combined) billing to the City Council."

Continuing, it is said in the opinion, that even though the provisions of Ordinance No. 55, insofar as they concern us here, were inadvertently repealed, and that the city officials appeared to be ignorant of that fact, the reason stated in the minutes of the City Council meeting of November 9, 1951, at which time the plaintiffs' demand for "combined" bill was refused, was that to grant the request *"would alter the established policy of billing for each individual* and would also affect many others who own more than one building and are billed on a separate unit basis." It is conceded that whereas the old ordinance No. 55 contained an express prohibition against "combined" billing, with the adoption of Ordinance No. 283 (repealing Ordinance No. 55 by implication) no rule or regulation was adopted actually prohibiting combined billing. The opinion continues: (Italics ours.)

" * * * plaintiffs argue that in the absence of such a rule or regulation the practice referred to (single billing) was unauthorized because of Sec. 49–1–3 of the code [A.C.L.A.1949] governing public utilities generally. I am of the opinion, however, that the language of that section clearly shows that it was not intended to apply to municipalities." (Bracket words inserted.)

The concluding paragraph of the opinion states:

"*Since it can hardly be disputed that the plaintiffs' housing projects are 'establishments' within the meaning of Schedule C,* the crucial questions are (1) whether the refusal of the City Council to grant the request for combined meter readings is equivalent to an authorization or ratification of the prac-

tice referred to, and, (2) if so, whether the practice conflicts with Schedule C. Since the language of Sec. 602.1 of Ordinance 283 is merely permissive and the Court has already held that Sec. 49–1–3 of the Code does not apply, *it follows that the City was not required to make such a practice the subject of a rule or regulation.*" (Italics inserted.)

"However, Schedule C necessarily implies that an 'establishment' is entitled to the benefits of the sliding benefits of the sliding scale of rates, whereas the construction placed upon this schedule by the City is that such an 'establishment' is entitled to this benefit only if the service is of the 1-point variety. *While this classification could hardly be said to be unreasonable, and therefor invalid,* yet, since it effectually excluded any establishment consisting of more than one building from the benefits of lower rates for increased consumption, I am of the opinion that it was in conflict with Schedule C *except where multiple meters were installed at the request of the consumer.*" (Italics ours.)

The judgment entered by Judge McCarrey contained the following orders:

" * * * Panoramic View Corporation, do have and recover judgment against the defendant City for the difference between the amount which it has paid to the defendant for electric power and the amount which should have been paid to the defendant, had defendant's promulgated and published rate schedule been properly applied * * * that defendant pay interest at the legal rate * * * that defendant * * * is restrained and enjoined from applying any rate schedule to plaintiff Panoramic View's establishment not based upon a proper, reasonable classification and in accordance with a promulgated and published schedule of rates * * * *"

We find that the opinion, so far as it may do service as and in lieu of findings of fact, is supported by the record. In its role of conclusions of law, should we hold that if the statement, "since it can hardly be disputed that the plaintiffs' housing projects are 'establishments' within the meaning of Schedule C", may be taken as a proper conclusion of law it is erroneous, and the conclusion should have been to the contrary.

Even if we were to concede that the opinion filed in this case could be treated as substituting for the conventional findings and conclusions we are of the opinion that it would not sustain the judgment entered, for it appears to us that neither the facts nor the law support the opinion. Let us scrutinize the facts as they appear in the record.

From 1925 until the date of the trial in 1955 it had been indisputably the policy, practice and procedure of the City to refuse "combined" billing. Indeed the original rate schedules, rules and regulations as incorporated in the original Ordinance No. 55 expressly prohibited the "combined" billing practice, except where the single metering was done by the City for its own convenience.

Ordinance No. 55 continued in effect until 1949 when repealed by implication by Ordinance 283. The opinion stated that it appeared that the City officials were unaware of the repealing effect of Ordinance No. 283, but be that as it may, the City continued its policy, practice and procedure of refusing "combined" billing. To overcome this established policy there should be some definite proof of the City's intention to depart therefrom.

Plaintiffs take the position that by adopting Ordinance No. 283 in 1949, of which Schedule C was a part, this in itself amounted to an abandonment of the "single" billing practice for the reason that this ordinance did not by rule

or regulation prohibit the practice which had theretofore been followed by the City for the past thirty years and which had been expressly authorized by Ordinance No. 55.

However, a review of the cases leads us to the conclusion that the majority of courts in passing upon this issue, of single versus combined billing practice by utilities, have held that where a schedule is silent on the subject the "combined" billing practice is as much proscribed as though the schedule, rules, or regulation had expressly prohibited it. To put the matter in a more simple way the majority of the courts hold that unless "combined" billing is expressly authorized it will not be permitted. We recognize that the cases are in some confusion in this area of public utility law, and a careful study of the cases, where "combined", or "conjunctive", billing was permitted, indicates that such practice was expressly authorized, or that the courts may have been influenced by the unusual fact situations involved rather than by a desire to depart from the generally accepted legal proposition that "combined" billing is not to be allowed unless expressly authorized.

Some of the authorities commenting on this problem, "single" versus "combined" billing by public utilities, are set out. The court in Land Title Bank & Trust Company v. Pennsylvania Public Utility Commission, 138 Pa.Super. 544, 10 A.2d 843, 846, was dealing with a somewhat similar problem as ours, the application of tariffs, metering, and manner of billing to a housing project consisting of some sixty-six separate buildings with a total of over two hundred and fifty apartments. In that case the plaintiff took the position that all of the meter readings should be combined, thereby permitting it the advantage of the wholesale rate. The Commission had a rule to the effect that " 'unless otherwise stipulated therein, the rates named in the Tariff for each class of service are based upon the supply of the service to one entire premise through a single delivery and metering point. Separate supply for the same customer at other points of consumption shall be separately metered and billed.' " It is to be noted that the City of Anchorage though not having an express rule since the adoption of its Ordinance No. 293 in 1949, but following its policy and practice in vogue since 1925, billed plaintiffs for service to each individual apartment house as a single establishment, based on a single delivery and metering point, that is it billed for each separate "house" meter in each of the separate apartment buildings.

We cite a further pertinent portion of the court's opinion in the Land Title Bank and Trust Company case:

" 'To sustain this complaint would be to sanction the organization of whole blocks of individual owners into associations like these for the sole purpose of affording themselves the benefits of a classification to which, as individuals, they would not be entitled. These associations could re-distribute the energy to the owners and occupants of the various premises. This device would not necessarily confine itself to electric companies but could be employed by individual owners to afford themselves the benefits of more favorable classifications of other utility companies. The effect of such an arrangement would be to result in upsetting the whole rate structure under which the service of the Philadelphia Electric Company and other utilities is furnished, to the detriment and discrimination of thousands of other individual consumers * * *'.

"To permit separate customer units to combine for single point service would be to violate the fundamental theory upon which the pricing of intervenor's tariff schedules are based."

On the point that "single ownership" of like premises does not, of itself au-

thorize "combined" billing see City of Raceland v. Colvin, 265 Ky. 12, 95 S.W. 2d 1113. In United States v. American Water Works Company, C.C., 37 F. 747, 749, a situation which was concerned with the application of meter readings to a group of buildings situate on government reservation known as Fort Omaha, in concluding that the government was not entitled to a "combined" billing, the court said:

> " * * * Suppose some one in the city owning a block of ground should put up 20 or 30 residences to rent; it would be a clear violation of the spirit of this ordinance to permit him to supply all these houses as though they constituted one property. Indeed, as nothing is said about contiguity, if ownership was the test, a man having buildings, residences, stores, and factories scattered in different parts of the city might insist upon a supply to all at the lowest rate; or, as neither ownership nor contiguity is spoken of, why might he not contract for all the water from defendant, and subcontract it to various consumers in the city? I think there can be little doubt on this. The practice which has obtained ever since defendant's waterworks were established correctly interprets the ordinance, and expresses its true spirit and meaning; and that gives defendant the right to treat each building as a separate consumer, and charge either for the building or at meter rates accordingly."

The New York Public Service Commission, in Realty Supervision Company v. Edison Electric Illuminating Company of Brooklyn, Public Utility Reports 1917B, p. 962, commented as follows:

> "I believe it (conjunctive billing) to be highly discriminatory * * * both against the larger consumer who takes the same amount of current with very much

less service, and the small consumer who cannot join with his neighbors to get a lower rate * * * It is plain that the person who owns numerous buildings, each with its service connection and its one or more meters, gets a great deal by way of service and facilities that another customer, consuming a like amount of current, but all in one building and with one service, does not get. Moreover, this conjunctional service contract is discriminatory against the owner or lessee of a small building which cannot be jointed under such a provision. He is forced to compete with his neighbor in the same type and size of a building and is penalized in his electric light or power bill because he or his landlord does not own any other buildings in the same block and within 100 feet. If there were some appreciable difference in the cost of the service to the fortunate owner or lessee the service to such owner or lessee could be rendered with appreciable economy to the companies, it would perhaps be proper that the owner of the single building should be charged more than the owner of three or four; but where the owner of several buildings receives for each building the same service as the owner of a single building, it is certainly discriminatory to allow the consumption in such buildings to be joined and the price of current reduced thereby."

In another ruling of the New York Public Service Commission, Re The New York Edison Co., et al., Public Utility Reports, N.S.1935, it was said:

> "The principal provision of the present rate schedules as to conjunctional billing is that buildings within 100 feet under common ownership or leasehold of record for at least five years, which may be supplied from one service, may be taken collectively as a basis of de-

termining the amount to be paid for electric service.

"The companies' proposal retains these conditions but provides in addition that the buildings may not be separated by a city street or public highway unless used by the customer as a unitary enterprise. This restricts somewhat the extent to which the rider may be applied.

"(7) Some form of conjunctional billing has been in operation for twenty-five or thirty years and this is apparently the first effort to restrict a service which is preferential and discriminatory. It is obvious that if a customer may combine several buildings which are not intercommunicating and which are served separately by the electric company, each having its own service and meter with all of the costs which such separate service implies, particularly as to meter readings, accounts and billings, and thus obtain a rate which is considerably lower than could be obtained if the separate properties were not so conjunctively billed, there must needs be some justification outside of the cost of the service. * * *"

Numerous other authorities could be cited but the foregoing are sufficient to indicate the general trend of thinking, and with which we agree.

The opinion upon which the judgment in this case is predicated assumes as its major premise that "combined" billing is permitted by "Schedule C Commercial." The concluding paragraph of the opinion states:

"*Since it can hardly be disputed that the defendants' housing projects are 'establishments' within the meaning of Schedule C,* the crucial questions are (1) whether the refusal of the city council to grant the request for combined meter readings is equivalent to an authorization or ratification of the practice referred to, and, (2) if so, whether the practice conflicts with Schedule C." (Italics inserted.)

It appears that this premise is false.

The applicable portion of Schedule C reads:

"This service applicable to single phase service for lighting, cooking, small appliances and incidental single phase motors not in excess of five (5) horsepower, *in professional, mercantile, industrial and other establishments* but not classed as single family residences." (Then follows the sliding or diminishing scale based on increasing consumption. Italics ours.)

If the statement in the opinion to the effect that the groups of apartment houses owned and operated by each plaintiff are "establishments" is to be sustained then that meaning must be determined from the foregoing quoted provision of Schedule C.

The conclusion set out in the opinion that plaintiffs were each entitled to a "combined" billing is premised on the proposition that each of the two groups of apartment houses is an "establishment" within the meaning of the schedule. That each of two groups, nineteen separate apartment houses in one and fourteen in the other, constitute but two establishments within the meaning of Schedule C we think is an unwarranted assumption, and inasmuch as the judgment must stand or fall on this assumption the proposition is worthy of some discussion.

We agree that the word "establishment" may, and does, have several shades of meaning, depending upon the context in which the word is used, and the particular purpose sought to be accomplished. What we strive for here is the meaning intended as the word was used in Schedule C. Nothing appearing to the contrary one must take it that the word "establishment" was intended to be, and is, used in its ordinary sense, that is the sense that the lay person would ordinarily use it.

Webster's Unabridged Dictionary gives what we take to be the ordinary every day definition as the place where one is permanently fixed for residence or business; residence, including grounds, furniture, etc., with which one is fitted out; also, any office or place of business, with its fixtures. Here the identity and operation of each plaintiffs' apartment house is separate and distinct from the others. The context indicates that it was intended that the word be used in the sense of a single establishment, rather than to include multiple like establishments. In Fleming v. American Stores Co., D.C., 42 F.Supp. 511, at page 521, the court in disposing of the contention that the word covered more than one unit said:

"I cannot subscribe to the defendant's view. To do so would be to do indescribable violence to the word 'establishment' in section 13(a) (2) [29 U.S.C.A. § 213(a) (2)]. It does not follow that because a unit of an enterprise is a component or necessary part of that enterprise, that it is to be so regarded as part and parcel of the whole enterprise as to lose its individual and separate identity as an establishment."

Construing the word "establishment" as used in Schedule C as meaning one unit, and not all the units in an enterprise, we are irresistibly led to the final conclusion, which is just the opposite one reached in the opinion, namely, that the City properly and correctly applied the Schedule C rates to each single apartment house.

There is, however, a more compelling and impressive argument for sustaining the interpretation given to Schedule C by the City and its Manager, and the practice followed in connection with it.

Section 602.1 of Ordinance No. 282, expressly empowered the City Manager to make and publish rates and charges for electrical energy and service, and Section 608.1 provides that the City Manager, with the approval of the City Council, may adopt and promulgate such rules and regulations as may be necessary pertaining to the supplying and discontinuance of electric service to all customers. Schedule C—Commercial Rate—promulgated under the authority conferred by the ordinance relates to "single phase service for lighting, cooking, * * * in professional, mercantile, industrial and other establishments but not classed as single family residences."

While a municipality cannot delegate any part of its governmental power it may, of course, delegate ministerial or administrative functions to its officials or employees. It may delegate the power and duty of carrying into effect valid ordinances adopted by it, thus the municipality may vest in its officers broad discretion in such matters as the application and enforcement of health laws, building regulations, and the administration of public utilities operated by it or by others. With the exception of vesting arbitrary power or authority in an officer or employee, grants of discretionary power to administrative officers is generally permissible, and, in fact, is the general practice. Without the power to delegate duty and discretion the affairs of the City could not be carried on.

It must be kept in mind that the courts cannot set aside city ordinances unless they are unconstitutional or ultra vires, or in some special connection or effect, unreasonable. On the contrary, unless the ordinance is unnecessarily oppressive or unreasonable it is the duty of the court to uphold it. It is a well settled rule that where an ordinance is passed relating to a matter within the legislative power of the municipality all presumptions are in favor of its constitutionality, and reasonableness, in short the presumption of reasonableness follows the ordinance.

The question of policy must be determined by the municipal legislative

authority, and the fact that courts may not agree with the announced policy is immaterial. If the municipality has power to enact an ordinance, it may not be set aside by the courts merely on the ground of hardship, harshness, injustice, unfairness or because of commercial advantages or disadvantages resulting from the enactment.

It is said that ordinances must be read and construed as a whole in the light of circumstances existing at the time of their adoption, with the proper regard for the consequences that would result from giving them a particular meaning, and the courts must keep in mind the object or purpose of the enactment. While it has been held that there can be no intent in an ordinance not expressed in words, it has been also held that that which is implied is as much a part of the ordinance as though the same were therein spelled out.

■ In construing an ordinance words employed will be taken in their ordinary and proper signification, unless it shall be plainly necessary to enlarge or modify the signification in order to effectuate the plain intent of the body enacting the ordinance.

■ In like manner the presumption of reasonableness follows the interpretation and construction given to an ordinance by the creating authority, and it will be presumed, the ordinance permitting, that all rules, regulations and practices adopted or invoked under its provisions are reasonable and consistent with the expressed purpose, at least until such time as the proof makes a showing to the contrary.

■ It is obvious that there was here delegated to the City Manager, with the approval of the Council, (1) the power and authority to make and publish rates and charges for power and service, and (2) to adopt and promulgate such rules and regulations as may be necessary. It is elementary that a municipal legislative body, here

the City Council, can properly delegate to its officer the power and duty of carrying its ordinances into effect. Hitchcock v. Galveston, 96 U.S. 341, 348, 24 L.Ed. 659. It is said that the modern tendency is to be liberal in upholding ordinances granting discretion to municipal administrative officers by reason of the increasing complexity of municipal administration.

True, neither the City Council, or the City Manager printed or published, any rules, regulations, nor practices relating to Schedule C other than those which appear in the schedule itself. But that does not prevent the adoption of rules, regulations, and practices supplementing and implementing the printed Schedule C. The practice with which we are here concerned is the separate billing of single establishments, and construing establishments to mean all users under one roof and within one structure or building, excluding from this classification groups of buildings.

This interpretation followed the practice of many years, was ratified by the City Council, and in fact was the interpretation of the Council speaking through its agent, the City Manager. There is no question but that the City had the right, and as a fact was compelled, to construe its own ordinance. Whether it did this in council meeting or by acquiescence in the interpretation of the City Manager is immaterial. The interpretation comports with the City's long established practice, maintians the policy determined to be in the public interest, is not inconsistent with the text of Schedule C, and gives the ordinary meaning to the words used, including the word "establishments."

We hold that the City had the power to construe and interpret, itself or through the delegated power of the manager, its own statutes, including the word "establishment" as used therein. Schedule C having been interpreted and construed, and a practice having

been adopted and followed in relation to its application, there is little ground here for the intercession of the court.

For all practical purposes what the plaintiffs seek is to have the court re-interpret Schedule C, including the word "establishments", and then determine whether or not "single" billing falls within a "practice" consistent with such interpretation. However, we can be of no comfort to plaintiffs on this score for we are compelled to accept the interpretation of the City and its Manager as to Schedule C, and the rules, regulations and practices in connection with the schedule. The practical construction adopted by the City and its officers is entitled to great weight and this court will accord it such. City of Sedalia ex rel. and to Use of Ferguson v. Shell Petroleum Corp., 8 Cir., 81 F.2d 193, 197, 106 A.L.R. 1327. There is no showing in the record before us that the City and its officers in interpreting and construing Schedule C, and in invoking the present practice of "single" billing followed in connection therewith, acted other than reasonably. There is no proof that the schedule under that interpretation and practice was or is arbitrary or discriminatory as to plaintiffs. For that reason we cannot now disturb, in review, the position taken by the City and its Manager.

In our opinion the City and its Manager properly construed and interpreted Schedule C, including the meaning of the word "establishments", and we are also of the opinion that the practice of "single" billing as used by the City is consistent with intent and purpose of Schedule C.

In view of our conclusions the several other ominous points lurking in the background of this case need not now be passed upon.

The judgment is reversed and the cause remanded with directions to enter judgment in favor of the City of Anchorage, defendant below.