**Roy GARRETT, Mary Garrett, Escondido Human Rights Committee, Jane Doe 1 and Doe Jane Doe 2, Plaintiffs,**

v.

**CITY OF ESCONDIDO, Defendant.**

**No. CIV. 06CV2434JAHNLS.**

United States District Court, S.D. California.

Nov. 20, 2006.

Alan McQuarrie Mansfield, Rosner and Mansfield, John David Blair–Loy, ACLU of San Diego and Imperial Counties, San Diego, CA, Christopher A. Brancart, Elizabeth N. Brancart, Brancart & Brancart, Pescadero, CA, Elliott Mincberg, People for the American Way Foundation, Washington, DC, Omar C. Jadwat, ACLU Immigrants Right Project, New York City, for Plaintiffs.

James R. Parrinello, Nielsen Merksamer Parrinello Mueller and Naylor, Mill Valley, CA, for Defendant.

## ORDER GRANTING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER

HOUSTON, District Judge.

### INTRODUCTION

Now before this Court is Plaintiffs Roy Garrett, Mary Garrett and Escondido Human Rights Committee's (collectively "Plaintiffs") application for a temporary restraining order ("TRO") to restrain Defendant City of Escondido ("Defendant") from implementing and/or enforcing Ordinance No.2006–38 R, Chapter 16E of the Escondido Municipal Code. Doc. No. 3. Oral argument was heard on November 16, 2006, with appearances by Phillip Tencer, Alan Mansfield, and David Blair–Loy for Plaintiffs, and Donald Lincoln and Christopher Garrett for Defendant. This Court, after hearing the oral argument of counsel, and after a careful consideration of the pleadings, relevant exhibits, and for the reasons set forth below, GRANTED Plaintiffs' application for temporary restraining order. The Court's oral ruling of November 16, 2006, is hereby incorporated by reference into this Order.

### BACKGROUND

On October 18, 2006, Defendant adopted Ordinance No.2006–38R titled "Establishing Penalties for the Harboring of Illegal Aliens in the City of Escondido" (the "Ordinance"). The Ordinance seeks to penalize "any person or business that owns a dwelling unit"[1] in the city of Escondido ("City") who "harbor[s] an illegal alien in the dwelling unit, knowing or in reckless

---

1. The Ordinance at the present time specifically targets individuals who own more than three rental units. Epp Ltr., Exh. 2 at 3 ("Presently, Escondido Municipal Code Section 16–17 requires a business license for all persons engaged in certain types of business ... The general practice of the City has been to require a business license for those who rent units in excess of three units; due to staffing constraints and availability of resources, enforcement of a business license is not requested for individual dwellings on a lot or for individual rooms in a homeowner's home.").

disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, unless such harboring is otherwise expressly permitted by federal law." Decl. of V. Calderon, Exh. 1, Minutes from October 4, 2006 Escondido City Council Meeting at 1; Exh. 3 at 1 and 3. The enforcement provisions allow for the suspension of an owner's business license if, upon receipt of a complaint and subsequent verification "with the federal government [regarding] the lawful immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City" of a violation of the Ordinance, an owner: 1) "let[s], lease[s] or rent[s] a dwelling unit to an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law"; 2) fails to correct a violation of the Ordinance upon "receipt of written notice from the City that a violation has occurred and that the immigration status of any alleged illegal alien has been verified"; or 3) fails to respond to the City within five business days of notification of the complaint. *See* Exh. 3. The suspension of an owner's license precludes the collection of rent or payment "from any tenant or occupant in the dwelling unit." Where more than one violation has occurred,[2] an owner would be subject to "a monetary penalty of up to $1000.00 per violation per day or a jail term of six months, or both." TRO Appl. at 4, citing to § 16E–2(h); EMC § 16–249. An illegal alien is defined in the Ordinance as:

> An alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq. The City shall not conclude that a person is an illegal alien unless and until an authorized representative of the City has verified with the

federal government, pursuant to United States Code Title 8, subsection 1373(c), that the person is an alien who is not lawfully present in the United States. *See* Exh. 3 at 3.

On November 3, 2006, Plaintiffs filed the instant complaint, asserting various constitutional rights violations against Defendant. Plaintiff filed a TRO application on November 7, 2006. Doc. No. 3. This Court, after reviewing Plaintiffs' TRO application, scheduled a hearing for November 16, 2006, with responses due by November 13, 2006. Doc. No. 4. On November 9, 2006, Plaintiffs filed an additional declaration by Estela de los Rios in support of their TRO application. Doc. No. 7. Defendant filed its opposition on November 13, 2006. Doc. No. 8. On November 14, 2006, the San Diego Apartment Association, California Apartment Association and the National Apartment Association (collectively "Apartment Associations") requested leave to file an amicus brief with this Court in support of Plaintiff's TRO application. Doc. No. 9. This Court granted the amicus parties' application. Doc. No. 11. Plaintiffs filed a request for judicial notice in support of their TRO application on November 15, 2006. Doc. No. 13.

### *DISCUSSION*

**I. Legal Standard**

■ The purpose of a temporary restraining order ("TRO") is to preserve the *status quo* before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers,* 415 U.S. 423, 439, 94 S.Ct. 1113, 39

---

**2.** Plaintiffs assert that the Ordinance defines each day "beginning ten business days after receipt of a notice of violation from the City" as a separate violation. *See* Exh. 3 at 3.

L.Ed.2d 435 (1974) (noting that a TRO is restricted to its "underlying purpose of preserving the *status quo* and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer"). As such, an applicant for a TRO is required to demonstrate "immediate and irreparable injury, loss or damage." Fed. R.Civ.P. 65(b); *see also Caribbean Marine Serv. Co., Inc. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988).

The standard for issuing a TRO is similar to the standard for issuing a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.,* 887 F.Supp. 1320, 1323 (N.D.Cal.1995). The Ninth Circuit recognizes two tests for demonstrating preliminary injunctive relief: the traditional test or an alternative sliding scale test. *Cassim v. Bowen,* 824 F.2d 791, 795 (9th Cir.1987). Under the traditional test, a party must show: "1) a strong likelihood of success on the merits, 2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, 3) a balance of hardships favoring the plaintiff, and 4) advancement of the public interest (in certain cases)." *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1120 (9th Cir.2005). Where a party demonstrates that a public interest is involved, a "district court must also examine whether the public interest favors the plaintiff." *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992).

Alternatively, a party seeking injunctive relief under Fed.R.Civ.P. 65 must show either (1) a combination of likelihood of success on the merits and the possibility of irreparable harm, or (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in favor of the moving party. *Immigrant Assistance Project of the L.A. County of Fed'n of Labor v. INS,* 306 F.3d 842, 873 (9th Cir.2002); *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir.1999); *Roe v. Anderson,* 134 F.3d 1400, 1402 (9th Cir.1998). " 'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.' " *Roe,* 134 F.3d at 1402 (quoting *United States v. Nutricology, Inc.,* 982 F.2d 394, 397 (9th Cir. 1992)); accord *Sun Microsystems,* 188 F.3d at 1119. "Thus, 'the greater the relative hardship to the moving party, the less probability of success must be shown.' " *Sun Microsystems,* 188 F.3d at 1119 (quoting *Nat'l Ctr. for Immigrants Rights v. INS,* 743 F.2d 1365, 1369 (9th Cir.1984)).

The Ninth Circuit makes clear that a showing of immediate irreparable harm is essential for prevailing on a TRO. *See Caribbean Marine,* 844 F.2d at 674. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Id.* Moreover, "a plaintiff seeking an injunction against a local or state government must present facts showing a threat of immediate, irreparable harm before a federal court will intervene." *Midgett v. Tri-County Met. Transp. Dist.,* 254 F.3d 846, 851 (9th Cir.2001). Thus, a plaintiff must show the presence of an "immediate threatened injury as a prerequisite to preliminary injunctive relief." *Id.,* citing *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).

## II. Analysis

### A. Judicial Notice

Prior to the TRO hearing, Plaintiffs requested that this Court take judicial notice of a Federal Register publication, 65 Fed. Reg. 58,301 (September 28, 2000), entitled "Responsibility of certain entities to notify the Immigration and Naturalization Service of any alien who the entity 'knows' is not lawfully present in the United States."

Doc. No. 13 at 1. Pursuant to the Federal Register Act, a federal court shall take judicial notice of regulations appearing in the Federal Register. *See* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed"); *Biodiversity Legal Foundation v. Badgley*, 309 F.3d 1166, 1179 (9th Cir.2002). Accordingly, this Court GRANTED Plaintiffs' request for judicial notice.

## B. Interpretation Memorandum

■ Defendant submits an "Interpretation Memorandum" (the "Memorandum") as support for its opposition to the TRO application, which Defendant asserts "is the City's Manager [sic] formal statement of how the Ordinance will be implemented." Resp. at 4. In his declaration, the City Manager states that he is "charged with managing the affairs of the City on a day to day basis" and "charged with implementing City policy." *See* Phillips Decl. at ¶ 3. The City Manager also declares that he is "the final authority on the City staff's interpretation of any ordinance." *Id.* Plaintiffs at oral argument contested the validity of the Memorandum, stating that the City's code gives no authority to the City Manager to interpret or amend the subject matter of the Ordinance.

■ From the record before this Court, it is unclear what binding effect, if any, the City Manager's Memorandum has on the construction of the Ordinance. Although administrative instructions or memoranda may be used by a court in construing a state statute or ordinance, the limiting construction may affect its analysis only if the construction is "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1035 (9th Cir.2006), citing to *City of Lakewood v. Plain Dealer Publish-*

*ing Co.*, 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). For example, in *Santa Monica Food*, the Ninth Circuit noted that the text of the ordinance in question "specifically provides that '[t]he City Manager, or his/her designee, shall adopt administrative regulations that are consistent with and that further the terms and requirements set forth within this chapter.'" 450 F.3d at 1026. Here, unlike in *Santa Monica Food*, the Ordinance does not explicitly allow for the textual incorporation of a later-drafted administrative policy memorandum. Moreover, the Ordinance contains no language that delegates any regulatory authority on the City Manager, nor does Defendant present any evidence indicating that the City Council or a legislative body, through judicial or administrative construction, delegated to the City Manager the power or authority to "interpret" and set forth regulations for implementing the Ordinance. Although the City Manager has declared that he is "the final authority on the City staff's interpretation of any ordinance," the lack of evidence of a well-established practice as required by the Ninth Circuit does not convince this Court at this time that the City Manager possesses the authority to draft an implementation memorandum that construes the subject matter of the Ordinance. The City Manager, with the record present before the Court, therefore, cannot step into the role of council member and interpret the scope of the Ordinance.

This Court also questions the propriety of a City policy memorandum to effectively amend a city ordinance where the plain language of the Ordinance does not limit its effects to prospective tenancy arrangements. In *Richardson*, the Ninth Circuit noted that "[w]hile a municipality cannot delegate any part of its governmental power it may, of course, delegate ministerial or administrative functions to its officials or

employees." 242 F.2d at 285. In the instant matter, the duties that have been allegedly delegated to the City Manager do not appear to be of an administrative or ministerial nature, but instead is of a legislative nature since it appears to amend the plain language of the Ordinance. For example, the phrases "to let, lease, rent" and "to suffer or permit" in the Ordinance indicate present, as well as future, lease or applicable agreements. Moreover, the Ordinance itself does not specifically address tenancy agreements that may be affected by enforcement, and in fact explicitly states that illegal aliens reside in units *"without typical leasing, payment and other tenancy arrangements."* Exh. 3 at 1 (emphasis added). The Memorandum, therefore, attempts to amend the Ordinance by significantly limiting the subject matter outside the plain language of the Ordinance.

■ In response, Defendant argues that the Memorandum construing the Ordinance as being " 'applied only to leases and rental agreements entered into *after* the effective date' " only reflects the "fundamental tenet of statute interpretation" that " '[s]tatutes do not operate retroactively unless there is a clear indication of intent that they do so.' " Resp. at 23 (emphasis in original), citing to *Hermosa Beach Stop Oil Coalition v. City of Hermosa Beach,* 86 Cal.App.4th 534, 103 Cal. Rptr.2d 447 (2001). Although Defendant is correct in its assertion that "a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication," *see Fernandez–Vargas v. Gonzales,* — U.S. —, —, 126 S.Ct. 2422, 2428, 165 L.Ed.2d 323 (2006) (citations omitted), it is unclear to this Court how the termination of a pre-existing tenancy agreement is a "retroactive" application of the Ordinance. As discussed, the Ordinance here does not contemplate the need of an owner to break a formal lease or agreement of a tenant once a tenant has been found to be an "illegal alien," as the Memorandum addresses. In fact, the Ordinance specifically contemplates that illegal aliens are more likely to "reside in dwelling units *without typical leasing, payment and other tenancy arrangements . . . such as written leases." See* Ordinance, Exh. 3 at 1–2 (emphasis added). Because the Ordinance does not address the breaking of any lease or rental agreement as the Memorandum contemplates, the breaking of a prior lease or rental agreement should not be a retroactive application of the Ordinance. Instead, a prospective application of the Ordinance would include newly entered leasing arrangements, existing leasing arrangements, as well as housing situations that do not have a typical leasing arrangement.

Accordingly, for the reasons stated above, this Court has serious concerns regarding the binding authority and validity of the Memorandum. As such, the Memorandum does not provide a limiting construction of the Ordinance, and will not be considered by this Court at this time.

## C. Irreparable Harm

■ Plaintiffs allege that irreparable injury will occur if the Ordinance is not enjoined because landlords in Escondido will be subject to fines and penalties if they do not violate their tenants "privacy rights or federal and state privacy laws by sharing confidential information with the City," including compelling landlords to "speak to the City" within five days of receipt of a complaint. TRO Appl. at 6. In addition, Plaintiffs further contend that the Ordinance forces landlords to: 1) "face uncertainty" regarding which acts constitute the harboring of illegal aliens given the complexity of federal immigration laws; and 2) choose between violation of the Ordinance or breaching valid contracts

such that it requires them to "engage in policing actions or impairing their existing contractual obligations." *Id.* at 6–7. Plaintiffs also assert that the Jane Doe Plaintiffs "risk being evicted from their homes at any time, even though they have U.S. citizen children living with them who attend school in Escondido, and even though they are employed in Escondido." *Id.* at 7. Finally, Plaintiff EHRC alleges that it will suffer irreparable harm because it is forced to divert its limited resources in order to "provide outreach opportunities to immigrants" in Escondido who are "confused and fearful" regarding the effects of the Ordinance. *Id.* Defendant asserts that Plaintiffs have misinterpreted how the Ordinance will be implemented, and that the Ordinance will not apply to the leasing arrangements outlined in Plaintiffs' declarations. Resp. at 6.

Plaintiffs have alleged irreparable harm to Jane Doe Plaintiffs 1 and 2. Jane Doe 1 specifically asserts that she lives in an apartment under a "month to month lease," and that she is afraid she will be "evicted from our home because of this ordinance." Decl. Jane Doe 1 at 2. Jane Doe 2 states that she has rented an apartment in Escondido since 1996, and is afraid of becoming homeless because if asked to leave her apartment, it would be difficult with her three children to find a place to live. Decl. Jane Doe 2 at 2. As discussed, this Court will not construe the Ordinance in light of the Memorandum, and therefore finds irreparable harm to Jane Does 1 and 2 real and immediate harm due to the threat of eviction if the Ordinance is enacted, especially where as here, Plaintiffs would have a difficult, if not impossible, time finding alternative housing where their kids attend school. *See Plyler v. Doe,* 457 U.S. 202, 221–222, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (illegal immigrant children irreparably harmed when deprived of access to education); *Mitchell v. U.S. Dept. of Housing and Urban Devel-*

*opment,* 569 F.Supp. 701, 704 (N.D.Cal. 1983) (irreparable harm with threat of eviction and limited housing availability in geographic area).

This Court also finds that Plaintiffs Roy and Mary Garrett will likely suffer irreparable harm because as landlords, they would be exposed to an imminent threat of litigation arising from the enforcement of the Ordinance as it presently reads. As discussed below, the Ordinance provides no guidance regarding the process of verification of a tenant's alienage status, nor does it provide for a meaningful hearing at a meaningful time. Finally, the Ordinance effectively requires that the landlord evict the tenant, even if a tenant disputes the City's violation determination or even if the landlord could not obtain the necessary information as mandated by the Ordinance. The threat of litigation for wrongful eviction by a tenant as a result of the Ordinance is therefore real, establishing irreparable harm to Plaintiffs Garrett. Accordingly, this Court finds that Plaintiffs have established a threatened and imminent irreparable harm, that cannot be adequately compensated at a later time. *See Sampson v. Murray,* 415 U.S. 61, 89–90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

**D. Public Purpose/Balance of Hardships**

Plaintiffs argue that the balance of hardships weighs in favor of Plaintiffs since no harm will come to the City if the Ordinance is enacted. TRO Appl. at 4–6. In response, Defendants argue that because the Ordinance should be presumed constitutional, and that the City has deemed the Ordinance "beneficial for its residents," the balance of hardship tips in favor of the City. Resp. at 9. To determine which direction the balance of hardship tips, "a court must identify the possible harm caused by the [TRO] against the

possibility of the harm caused by not issuing it." *University of Hawaii Professional Assembly v. Cayetano,* 183 F.3d 1096, 1108 (9th Cir.1999).

Plaintiffs first contend that the enactment of the Ordinance prohibiting illegal aliens from obtaining housing in Escondido will not relieve the perceived problems of urban blight put forth by Defendant, pointing out that the study used by Defendant to justify the Ordinance did not cite illegal immigrants as the source of housing problems, but that the blight conditions in the Mission Park area were due to the "high costs of housing and the unavailability of affordable subsidized housing in Escondido." *Id.* at 4. Plaintiffs also point out that while the Ordinance's findings make reference to crime caused by the illegal immigrant population, the public record supports that crime significantly declined in the most recent crime statistics available. *Id.*

Defendant responds that the referred to study identified an "increasing trend of urban blight in at least one section of Escondido," and that during City Council meetings, testimony was given suggesting that "the landlords' rental of housing to illegal aliens likely compounded the identified blighted conditions due to the fact that illegal aliens do not wish to draw attention to themselves, and therefore, would not bring substandard property maintenance conditions and related problems to the attention of City enforcement officials." Resp. at 2. Defendant also adds since a city ordinance should be presumed valid, "the balance of hardship tips in favor of the City and the TRO should be denied." Resp. at 9.

The Ordinance cites several reasons for enactment of a ban against housing rental or other arrangements with illegal aliens, including: 1) the harboring of illegal aliens endangers the health, safety and welfare of its citizens; 2) criminal activities of illegal aliens; 3) illegal aliens are less likely to enter into legal tenancy arrangements; and 4) illegal aliens are less likely to report housing and property maintenance violations, which remain unreported. *See* Ordinance, Exh. 3 at 1–2. Plaintiffs argue that the Ordinance will not affect overall levels of criminal activity, and provide evidence in support of their argument that the crime rate actually declined in the City in 2005. *See* Calderon Decl., Exh. 6. Plaintiffs also assert that the City in passing the Ordinance, impermissibly tied any alleged criminal activity to illegal aliens without any supporting evidence that illegal aliens actually caused the crime. This Court finds that the evidence supports Plaintiff's argument in regards to criminal activity. The statistics provided by Plaintiffs, which are not refuted by Defendant, supports that no increase in criminal activity has occurred, nor that illegal aliens are or should be tied to any alleged criminal activity in the City. Plaintiffs' arguments regarding a lack of support for criminal activity caused by illegal aliens, therefore, is persuasive.

In regards to endangering the health, safety and welfare of its citizens, the City again fails to provide support for its statements. The City points to a report done by California State University San Marcos (CSUSM) entitled "Mission Park Community Survey" that addresses urban blight in the City of Escondido. *See* Calderon Decl., Exh. 4. Although the report does outline a problem with overcrowding and disrepair of rental housing in this area, the report attributes these problems specifically to the high cost of housing in the area and the lack of affordable housing, where housing costs on average exceed 75% of a renter's income in this geographic area. *Id.* at 17, 53 et seq. In addition, although the report does generally state that "[r]enters who are new immigrants and/or are exceeding the unit capacity are also

less likely to complain or identify maintenance problems that could lead to unhealthy housing," the report specifically recognizes that it "did not collect information about citizenship status." *Id.* at 15, 18. Accordingly, it is unclear to this Court how the urban blight spoken of by Defendant as the purpose behind the Ordinance can be directly or indirectly attributed to illegal immigrants since illegal immigration or any blight that might be caused thereby was not the focus of the study. Without such proof, there appears to be no public benefit to its citizens, or other legitimate public purpose for enacting the Ordinance, and the balance of hardships tips sharply in favor of Plaintiffs.

Finally, Defendant conceded during oral argument that the issuance of a TRO staying enactment of the Ordinance would result in no actual prejudice to the City. Defendant recognized that while the City would like to begin enforcement of the Ordinance, the City would not lose benefits, or funds that it would be otherwise entitled, should the Court issue the TRO. Accordingly, this Court finds that this factor weighs in favor of granting Plaintiffs' TRO application.

### E. Serious Questions Going to the Merits

Plaintiffs assert that there are serious questions regarding the constitutionality of the Ordinance, and that they will likely succeed on the merits of their claims. Plaintiffs allege several constitutional violations, including under the: 1) supremacy clause; 2) California Constitution; 3) contracts clause; 4) First Amendment and Art. I., § 2(a) of the California Constitution and 5) Fourteenth Amendment due process.[3]

The Court initially notes that there is a "strong presumption of constitutionality that applies to legislative enactments," such that a plaintiff must "allege some sort of improper purpose or insufficient justification in order to state a colorable federal claim for relief." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California,* 482 U.S. 304, 327, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). The burden lies with the party challenging the ordinance to demonstrate any alleged constitutional violations. *See New Orleans Public Service v. City of New Orleans,* 281 U.S. 682, 686, 50 S.Ct. 449, 74 L.Ed. 1115 (1930) ("The ordinance is presumed to be valid and the burden is upon the appellant to show that ... [the ordinance] deprive[s] appellant of its property without due process of law." (citations omitted)). In *City of Anchorage v. Richardson Vista Corp.,* 242 F.2d 276 (9th Cir.1957) (Richardson), the Ninth Circuit commented on the duties of a district court to uphold an ordinance "unless the ordinance is unnecessarily oppressive or unreasonable." *Id.* at 285. "It must be kept in mind that the courts cannot set aside city ordinances unless they are unconstitutional or ultra vires, or in some special connection or effect, unreasonable." *Id.* Accordingly, this Court must exercise a presumption of constitutionality of the Ordinance, absent a showing by Plaintiffs to the contrary.

#### a. *Supremacy Clause*

Plaintiffs first argue that the Ordinance violates the supremacy clause because the Ordinance impermissibly attempts to regulate immigration. TRO Appl. at 10. Defendants argue that the Ordinance is not

---

3. The TRO application does not address the equal protection, 42 U.S.C. § 1981, Federal Fair Housing Act, Fair Employment and Housing Act, Unruh Act, legitimate police powers violation and state law preemption claims that are asserted in the complaint.

preempted by federal law because it does not regulate immigration. Resp. at 9.

■■■ The parties agree that *DeCanas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976), provides the relevant factors for determining whether a city ordinance impermissibly preempts federal law. *See* TRO Appl. at 9; Resp. at 9. In *DeCanas*, the Supreme Court reviewed the constitutionality of a California state law prohibiting employers from hiring illegal aliens.[4] The Supreme Court, while recognizing that the "[p]ower to regulate immigration is unquestionably exclusively a federal power," found that there is no *per se* preemption against state statutes where aliens are a subject matter of the legislation. "[S]tanding alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." 424 U.S. at 355, 96 S.Ct. 933. Instead, the Supreme Court established three ways in which a state ordinance may be preempted by federal law: 1) where the local law attempts to regulate immigration; 2) where the local law attempts to operate in an area occupied by federal law; and 3) where implementation of the local law is an obstacle or "burdens or conflicts in any manner with any federal laws or treaties." *See id.* at 354, 362–363, 96 S.Ct. 933.

### 1. Regulation of Immigration

Plaintiffs assert that the Ordinance is an impermissible attempt to regulate immigration because it seeks to decide "who may stay and who must depart," which "is the very core of immigration regulation." TRO Appl. at 10–11. Plaintiffs also assert

that any regulation that seeks to deny abode to undocumented immigrants "impermissibly interferes with the exclusive federal power over immigration." *Id.* at 11, citing to *Graham v. Richardson*, 403 U.S. 365, 380, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

Defendant replies that the Ordinance does not violate the supremacy clause because it does not "determine who can enter or remain in this country." Resp. at 9. Defendant emphasizes that " 'it is the creation of standards for determining who is and is not in this country legally that constitutes a regulation of immigration in these circumstances, not whether a state's determination in this regard results in the actual removal or inadmissibility of any particular alien.' " *Id.* at 9–10, quoting *Equal Access Educ. v. Merten*, 305 F.Supp.2d 585, 603–04 (E.D.Va.2004). Defendant concludes that since the Ordinance "defers entirely to *federal* law concerning the immigration status of a rental applicant" it does not in and of itself regulate immigration. *Id.* (emphasis in original).

■■■ Whether a state law impermissibly regulates immigration is dependent upon whether the regulation is "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355, 96 S.Ct. 933. A review of the language appears to support that the Ordinance does not attempt to impermissibly regulate immigration. The Ordinance does not determine the condition under which an individual may remain in the country, relying solely on federal agencies and authorities to make that determination for the City. Accordingly, the Court finds Defendant's

---

4. The California law at issue stated "[n]o employer shall knowingly employ an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." 424 U.S. at 352, 96 S.Ct. 933, quoting Cal. Labor Code Ann § 2895(a).

argument persuasive that the Ordinance is not likely preempted under the first prong of *DeCanas*.

### 2. Field Preemption

Plaintiffs next argue that the Ordinance is also invalid because "the federal government has comprehensively legislated generally in the field of immigration and specifically with respect to the harboring of undocumented immigrants." TRO Appl. at 12. Plaintiffs specifically point to 8 U.S.C. § 1324 as support that the federal government has already addressed the legality of " 'harboring' individuals who have violated immigration laws," and accordingly well occupies this field. *Id.* at 13. In response, Defendant states that the "Ordinance regulates only the landlord-tenant relationship, an area of law not completely occupied by the INA." Resp. at 11.

In *DeCanas*, the Supreme Court found preemption of a state employment regulation did not occur where " 'in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' " 424 U.S. at 356, 96 S.Ct. 933. The Court found that Congress, through the Immigration and Naturalization Act, did not intend to affect "state regulation[s] touching on aliens in general, or the employment of illegal aliens in particular," noting especially that respondents could not point to any specific wording or legislative intention. *Id.* at 358, 96 S.Ct. 933.

The Court finds that the facts in *DeCanas* are inapposite to the instant action. Unlike the field of employment, where federal law did not legislate nor did Congress contemplate legislation in this area at the time the Supreme Court ruled in *DeCanas*, federal statutes specifically provide for fines and criminal penalties for the harboring of illegal aliens. In particular, 8 U.S.C. § 1324 provides for criminal penalties where a person "(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation", in addition to where a person "(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." *See* 8 U.S.C. § 1324(a)(1)(A)(iii)—(iv). It appears that Federal law, therefore, may occupy the same field in which the Ordinance attempts to legislate. Further support for this finding appears in the language of the Ordinance itself, which states that the act of housing that the Ordinance seeks to regulate is within the definition of "harboring". *See* Ordinance, Exh. 3 at 2 ("United States Code Title 8, subsection 1324(a)(1)(A) prohibits the harboring of illegal aliens. The provision of housing to illegal aliens is a fundamental component of harboring."). Accordingly, this Court finds serious concerns in regards to the field preemption of the Ordinance by existing federal statutes.

### 3. Burdens or Conflicts With Federal Law

Plaintiffs also argue that the Ordinance conflicts with individual provisions of Federal law, pointing out that there are "numerous · categories of persons who may technically not be lawfully present in the United States [but who] are nonetheless permitted to live and work in the United States with the full knowledge of the federal government." TRO Appl. at 14. Plaintiffs also point to 8 U.S.C. § 1254a and 8 C.F.R. § 212.5(f) for support that federal officials have considerable discretion "not to deport persons who are other-

wise removable," and presumably listed on a federal list as an illegal alien.

In response, Defendant states the Ordinance does not stand as an obstacle to federal immigration laws, but instead "is harmonious with its purposes and objectives." Resp. at 13. Stating that the INA's intent is to "remove incentives for illegal immigration," and recognizing that " 'harboring' illegal aliens is unlawful and punishable for up to ten years imprisonment" according to federal law, Defendant argues that the Ordinance and Memorandum "make clear that the City has no intent to frustrate the federal immigration scheme with respect to aliens permitted by the federal government to live and work in the United States or those aliens that are in the process of obtaining legal status." *Id.* at 14.

A review of the Ordinance language appears to support that it could stand as a burden or obstacle to federal law as it currently stands. The Ordinance states that "[t]he City shall not conclude that a person is an illegal alien unless and until an authorized representative of the City has verified with the federal government, pursuant to United States Code Title 8, subsection 1373(c), that the person is an alien who is not lawfully present in the United States." Ordinance, Exh. 3 at 3. The Ordinance further looks to federal immigration officials to determine the lawful status of the tenant in question, and only if a federal immigration official can answer that the tenant is an "illegal alien" will the Ordinance be applicable. Defendant states in oral argument and through its Memorandum that it could make use of the federal government's Systematic Alien Verification for Entitlements (SAVE) program to carry out this task. It is unclear to this Court, however, whether Defendant would be entitled to use the SAVE program where the Ordinance seeks to regulate landlord-tenant relationships out-side of the scope of a public benefit. *See* Def. Exh. B–1 at 1. In addition, federal regulations make clear that federal or state entities charged with reporting to the federal government the alienage status of an individual must first themselves make a "formal determination that is subject to administrative review" on an individual's alienage status. 65 Fed.Reg. 58,-301 (September 28, 2000). Because of the purpose of the SAVE program as a query for public benefit uses, as well as the federal regulations' clear mandate placing the responsibility of determining an individual's alienage status on the local or state entities themselves, this Court has serious concerns regarding Defendant's use of federal resources and procedures for a private benefit, and the burden that it would cause to the federal government for the latter to conduct a formal hearing to make the requisite finding of fact and conclusions of law for the Defendant. That the Ordinance uses the Immigration and Nationality Act to define "illegal alien" implies that it will likely place burdens on the Departments of Justice and Homeland Security that will impede the functions of those federal agencies. *See* Exh. 3 at 2. The Court, therefore, has serious concerns regarding the burden this Ordinance will place on federal regulations and resources.

Accordingly, for the foregoing reasons, this Court finds that Plaintiffs have raised serious concerns regarding the constitutionality of the Ordinance and its preemption by federal law.

b. *Due Process*

Plaintiffs argue that the Ordinance "facially deprives Plaintiffs of due process" because it "fails to provide either landlords or tenants with any notice or opportunity to be heard before depriving them of fundamental liberty and property rights." TRO Appl. at 21–22. Plaintiffs cite to

legitimate property interests, and the Ordinance's provisions which lack any "right to notice and opportunity to be heard *before* deprivation of liberty or property." *Id.* at 22 (emphasis in original). Plaintiffs also contend that the "Ordinance provides tenants with *no* opportunity to challenge their designation as 'illegal aliens.' " *Id.* at 23 (emphasis in original).

Defendant responds that there is no violation of Plaintiffs' due process rights because there is "substantial process that must be completed prior to the enforcement of any penalty" and there are substantial appellate opportunities "permitting a property owner to contest such a suspension," as well as the right of both landowners and tenants to avail themselves of California's eviction procedures. Resp. at 16. Defendant also points to the Memorandum, which outlines that a property owner has several alternatives, including, (1) seeking "additional information from the tenant in an attempt to establish the tenant's legal status"; and (2) commencing "steps under state or federal law to end the tenancy." *Id.* at 17, citing to Phillips Decl., Exh. B at 2–3.

The right to be heard prior to the deprivation of a property interest is a fundamental protection of the Due Process clause. "[T]here can be no doubt that at a minimum [the Due Process Clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "A constitutionally protected property interest results 'from a legitimate claim of entitlement ... defined by existing rules or understandings that stem from an independent source.' " *Groten v. California*, 251 F.3d 844, 850 (9th Cir. 2001), quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d

548 (1972). Here, Plaintiffs have a legitimate property interest in collecting rent under its leases, as well as the incursion of costs associated with any eviction procedures that the Ordinance requires a landlord to undertake if a tenant is found to be an illegal alien. *See Cook v. City of Buena Park*, 126 Cal.App.4th 1, 6, 23 Cal.Rptr.3d 700 (2005). Accordingly, Plaintiffs have legitimate property interests that require Defendant to provide adequate process before the landlords are deprived of that property interest.

Defendant argues that the procedures subscribed to by the Ordinance to determine a tenant's alienage status are sufficient to meet the due process rights of Plaintiffs. First, as discussed, the provisions relied upon by Defendant to determine a tenant's status require a "formal determination that is subject to administrative review" prior to submission of the information to the Department of Justice. The Ordinance provides no such undertaking by the City, nor does it provide any type of administrative review available to either the landlord or tenant to contest the findings of the City or the federal government prior to the requirement to initiate eviction proceedings by the landlord. The Ordinance, therefore, provides no recourse to Plaintiffs prior to the deprivation of a life, liberty or property interest, including the withholding of rents as well as the possible administration of fines and a jail term of up to six months.

Second, Defendant presents no support for its contention that the procedures for determining a tenant's status satisfies a tenant's due process rights. The Supreme Court makes clear that illegal aliens are also afforded rights under the Due Process clause:

The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, with-

out due process of law; nor deny to *any person within its jurisdiction the equal protection of the laws."* ... Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as "persons" guaranteed due process of law by the Fifth and Fourteenth Amendments.

*Plyler,* 457 U.S. at 210, 102 S.Ct. 2382 (emphasis in original). Because the Ordinance fails to provide for notice or hearing of any kind prior to the deprivation of an illegal alien's tenancy interest, this Court has serious concerns regarding the constitutionality of the Ordinance under the Due Process clause.

 Defendant further argues that sufficient appellate procedures are available to Plaintiff landlords that satisfy the due process requirement. However, "[t]he right to prior notice and a hearing" under the Due Process clause can only be abridged " 'in extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' " *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), quoting *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Defendant presents no evidence of an extraordinary circumstance that would justify the lack of notice and hearing prior to the deprivation of Plaintiff landlords' property interest. Moreover, from the record before the Court, it is not apparent that the appellate proceedings referred to by Defendant provide a hearing within a meaningful time in a meaningful manner sufficient to satisfy Plaintiffs' Due Process rights.

Finally, Defendant again fails to address any legally sufficient type of procedural due process available to tenants who are deemed illegal aliens. As discussed, the Fourteenth Amendment guarantees illegal aliens due process prior to the deprivation of a property interest. Accordingly, it appears that there are serious concerns regarding due process considerations of the Ordinance, weighing heavily in favor of granting Plaintiff's TRO application.

### c. *Conclusion*

For the foregoing reasons, this Court finds serious questions exist going to the merits of this matter. Together with the Court's previous findings of irreparable harm and a balance of hardships tipping sharply in Plaintiffs' favor, this Court accordingly GRANTS Plaintiffs' application for temporary restraining order.

### F. Bond Requirement

 Federal Rules of Civil Procedure 65(c) require the posting of security by plaintiff "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The Ninth Circuit has no steadfast rule as to the amount of a bond as a result of the issuance of a preliminary injunction. Generally, the bond amount should be sufficient "to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully." *Edgar v. MITE Corp.,* 457 U.S. 624, 649, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), citing to Fed.R.Civ.P. 65(c). The Ninth Circuit gives wide discretion to the issuance of preliminary injunction bonds, holding that "[s]o long as a district court does not set such a high bond that it serves to thwart citizen actions, it does not abuse its discretion." *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1126 (9th Cir. 2005).

 Plaintiffs argue that "[t]here should be no or only a nominal bond, since there is no cost to Escondido if enforcement of the Ordinance is deferred." TRO Appl. at 24. Defendant does not address this point in its brief. Because Defendant has already conceded that no actual harm would come as the result of the issuance of a TRO, this Court finds that a minimal bond would be sufficient here. Accordingly, Plaintiffs shall post a bond of $100.00 pursuant to Fed.R.Civ.P. 65(c).

### CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' request for judicial notice [Doc. No. 13] is **GRANTED.**

2. The Court's oral ruling of November 16, 2006, is incorporated by reference into this Order.

3. Plaintiffs' Application for a Temporary Restraining Order [Doc. No. 3] is **GRANTED.** Defendant City of Escondido is prohibited from enforcing Ordinance No.2006–38R titled "Establishing Penalties for the Harboring of Illegal Aliens in the City of Escondido" until a hearing on the preliminary injunction and determination on its merits of the same.

4. This Order shall be effective upon the posting of a bond of $100.00 by Plaintiffs pursuant to Fed.R.Civ.P. 65(c) **on or before 4:00 p.m. on November 22, 2006.**

5. Plaintiffs shall file and serve their preliminary injunction brief with this Court on or before January 12, 2007.

6. Defendant shall file and serve their opposition brief **on or before February 2, 2007.** Plaintiff may file and serve their reply brief **on or before February 16, 2007.**

7. The preliminary injunction hearing shall be heard on **March 8, 2007, at 2:00 p.m.**

**IT IS SO ORDERED.**